Stephen H. NATHANSON, Appellant,

v.

STATE of Alaska, Appellee.

No. 2541.

Supreme Court of Alaska.

Aug. 27, 1976.

William H. Fuld, Kay, Christie, Fuld & Saville, Anchorage, for appellant.

Avrum M. Gross, Atty. Gen., Juneau, Gerald W. Markham, Asst. Atty. Gen., Anchorage, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, ERWIN and BURKE, Justices.

## OPINION

ERWIN, Justice.

Stephen Nathanson, a commercial fisherman residing in the Seldovia, Alaska, area, was convicted by a superior court jury of fishing for king crab before the 1974 season opened, a violation of AS 16.05.920. Prior to trial Nathanson moved to suppress all evidence which was obtained by a search and seizure of his crab pots. The superior court denied Nathanson's motion to suppress, and this appeal is based on the denial of that motion.

The facts disclose that a new regulation,[1] enacted just prior to the 1974–75 season, provided that fishermen could place their crab pots in the water up to 72 hours prior to the opening of the season. Deciding to check the extent of the compliance with this new regulation, officials of the Fish and Game Department began a search of the crab pots in the Kachemak Bay area, starting at Seldovia.

On July 31, 1974, the officers inspected gear in the Seldovia area and discovered that some of the pots, all bearing the same registration number, were baited and contained king crab. Prior to the time the pots were searched, they were lying on the sea floor, approximately 35 fathoms below the surface of the water. The location and ownership of the pots were determined from buoys bearing Nathanson's registration number. Because the pots weighed more than 300 pounds and measured six feet in each direction, the officers utilized a mechanical winch to raise each of the crab pots.

The officers seized several pots, the bait and the crab as evidence. On the morning of August 1, 1974, the officers interviewed Nathanson and in his boat proceeded out to where his gear was located in the bay; however, they returned to shore shortly thereafter when Nathanson announced that he wanted to consult with an attorney. Later that day the officers pulled Nathanson's eight remaining pots and seized three bait containers. The pots and bait containers with the stored bait were subsequently exhibited to Nathanson, who identified them as his.

Neither of the warrantless searches and seizures were preceded by notice to Nathanson, as is required in certain fish and game cases under AS 16.05.180.

Before the trial commenced, Nathanson presented a number of pretrial motions concerning the seizure. The trial court found that the fish and game officers failed "to comply with" AS 16.05.180, but that this failure did not compel the application of the exclusionary rule; and that Nathanson had "no reasonable expectation of privacy in the crab pots." Thus, he concluded the evidence was admissible at trial.

In this appeal Nathanson contends that the officers' activity outlined above constitutes an illegal search in that it violates both the Fourth Amendment of the United States Constitution and Article I, Section 14, of the Alaska Constitution.[2] Al-

---

1. 5 AAC 34.050(c). During the closed season for king crab in any given king crab registration area, king crab pots shall either be removed from the water or stored, with all bait and bait containers removed, in 25 fathoms of water or less, unless otherwise specified in this chapter. Pots with all doors secured fully open and with all bait and bait containers removed may be stored in water depths greater than the maximum permissible depth for 72 hours prior to the opening of the king crab season, and for 72 hours after the season closure where the pots are fished.

2. The United States Constitution, Fourth Amendment, provides in part:
   The right of the people to be secure in their persons, houses, papers, and effects,

so, he contends that even if the search were constitutionally proper, it was nevertheless unreasonable because the officers did not comply with AS 16.05.180, the notice statute. We shall address each of the assertions in turn.

In *Katz v. United States*,[3] the United States Supreme Court spelled out the protection guaranteed by the Fourth Amendment:

> The Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may constitutionally be protected. (Citation omitted)

In a subsequent opinion, *Terry v. Ohio*,[4] the Court stated:

> We have recently held that "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 [582], (1967), and wherever an individual may harbor a reasonable "expectation of privacy," *id.*, at 361, 88 S.Ct. at 507, [19 L.Ed.2d at 588] (Mr. Justice Harlan, concurring), he is entitled to be free from unreasonable governmental intrusion.

■ In *Smith v. State*,[5] this court adopted, for purposes of determining what constitutes a "reasonable expectation of privacy" under the Alaska Constitution, the test first articulated by Justice Harlan in his concurrence in *Katz*:

> [T]here is a twofold requirement, first, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." [6]

Of course, the content and incidence of this constitutional protection must be shaped by the context in which it is asserted.[7] Therefore, in determining whether Nathanson had a reasonable expectation of privacy which will stand up under constitutional scrutiny, we must examine his Fourth Amendment interest in the context of commercial crab fishing.

■ Alaska's fisheries are unquestionably an important resource of this state, for they provide a source of food and employment for the people of this state. As we recently noted in *State v. Bundrant*,[8] fishing is the "largest single industry in Alaska and crabbing is a substantial portion of that activity." To insure the viability of this resource and the welfare of those dependent upon it, the State has broad powers in the regulation of the fisheries in the areas off the coast of Alaska.[9] Commercial crabbing is closely regulated by the State, with nearly every phase of the operation coming under public scrutiny through licensing and inspecting of vessels and gear. For instance, prior to fishing for king crab in a registration area, the owner

against unreasonable searches and seizures, shall not be violated, . . .

The Alaska Constitution, Article I, Section 14, provides in part:

The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated.

3. 389 U.S. 347, 351–52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967).

4. 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed. 2d 889, 899 (1968).

5. 510 P.2d 793, 797 (Alaska 1973).

6. *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (1967).

7. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

8. *State v. Bundrant*, 546 P.2d 530, 540–541 (Alaska 1976).

9. *State v. Bundrant*, 546 P.2d 530 (Alaska 1976); *see also Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). Fishing resources are held in trust by the state for the use of all its citizens. *Geer v. Connecticut*, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896); *Ex parte Bailey*, 155 Cal. 472, 101 P. 441 (1909); *Graves v. Dunlap*, 87 Wash. 648, 152 P. 532 (1915).

of a crab vessel must have it registered and its holds or live tanks inspected, as well as having its fishing gear licensed and registered for the registration area.[10]

■ In reviewing the relevant statutes and administrative regulations in this industry, we find that the commercial fishing for king crab does not share the same attributes of privacy as does the nature of the business conducted in a telephone booth, business office, store or hotel room.[11] King crab fishing involves public exposure. The fishermen, vessels, and gear are highly visible in the registration areas. The presence of the pots in the water is readily apparent from the buoys which mark their location and identify the owners of the pots. The buoys expose the crabbing operation, alert the officers of the Fish and Game Department to the presence of the pots, and draw the officers' attention to the pots' contents.

■ Nathanson made no attempt to conceal the location of his pots. Buoys bearing his fish and game registration number clearly marked their location and identified him as the owner. The buoys themselves were neither hidden nor disguised so as not to disclose Nathanson's activities in the registration area prior to the opening of the crabbing season. One purpose of the requirement for marking buoys is to permit officers to check for violations of the regulations. A person in Nathanson's position must have anticipated that his pots were subject to inspection. The setting of the pots with the attached buoys, thus, in effect invited the officers to stop and inspect for compliance with the regulation, to check the pots externally for fully open and secured doors and internally for the removal of bait and bait containers.

10. 5 AAC 34.020(c) ; 5 AAC 34.030(a).

11. See *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921) ; *Davis v. United States*, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946) ; *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

12. Thus, the superior court also did not err in denying appellant's motions for reconsideration and for a protective order.

■ We find, therefore, that fishermen such as Nathanson could not harbor an "actual (subjective) expectation of privacy" in conducting their crabbing operation in the waters of the state, at least not one that "society is prepared to recognize as reasonable." Thus, Nathanson had no protectable federal or state constitutional interest in the seized evidence.[12]

There remains the question of whether the officers complied with the special statutory requirements for conducting searches in the fisheries.

Nathanson asserts that because no notice and reason for the search were given before the search was conducted,[13] the fruits of the July 31 search were inadmissible at trial. AS 16.05.180, which he cites for this proposition, provides that:

Each person designated in § 150 of this chapter may without a warrant search any thing or place if the search is reasonable or is not protected from searches and seizures without warrant within the meaning of § 14, art. I of the state constitution, which specifically enumerates "persons, houses and other property, papers and effects." However, before a search without warrant is made a signed written statement by the person making the search shall be submitted to the person in control of the property or object to be searched, stating the reason the search is being conducted. A written receipt shall be given by the person conducting the search for property which is taken as a result of the search. The enumeration of specific things does not limit the meaning of words of a general nature.

■ The statute requires that notice be given to the person "in control" of the

13. It appears from the record that the eight pots which were seized on August 1, 1974, the day the commercial crab fishing season opened, were not introduced at trial. In any event, since Nathanson did not move for the suppression of these pots in the lower court, we need not determine whether they were improperly seized by the officers.

pots. When the officers of the Fish and Game Department approached the pots on July 31 to conduct the search, Nathanson was not present, attending to his crab pots. There being no "person in control of the property or object to be searched," the officers were unable to give him the required notice. We think that it would frustrate the governmental purpose behind the regulation to require the officers to hold in abeyance the search in order to discern the whereabouts of the fisherman in control or to arrange with him in advance for a convenient time to conduct the search. To do so would not promote effective enforcement of the regulation that the doors of the crab pots be secured, fully open and bait and containers removed when the pots are stored in the water 72 hours in advance of the opening of the season.[14]

We find, then, that the failure to notify Nathanson was not a violation of statute under the facts of this case.[15]

The decision is affirmed.

14. *Cf. United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87, 92 (1972), involving a warrantless search in a federally regulated industry, where the court stated,

> . . .. if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential.

The considerations leading us to conclude that no notice was required under the circumstances would not apply to the search of a vessel, building or other effects in which the owner would have a reasonable expectation of privacy.

15. We do not reach the question as to the appellant having impliedly consented to the search by accepting a license to operate crab gear in the registration area. See *People v. White*, 259 Cal.App.2d Supp. 936, 65 Cal. Rptr. 923 (1968).